IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

XF, LLC, an Illinois limited
liability company; A.
Lawrence Carroll and Regina
C. Rafferty, Individually, as
Executor of the Estate of
J. Robert Collins; and as
Successor Trustee of the J.
Robert Collins 2006 Trust,

                 Plaintiffs,

      v.

ACE American Insurance
Company,

              Defendant.

Case No. 20 C 4756

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

### I.   BACKGROUND

This is an insurance coverage dispute concerning two private management liability insurance policies consecutively issued by Defendant Ace American Insurance Co. ("Ace"). The three plaintiffs, XF, LLC, (formerly known as RCG Holdings, LLC); A. Lawrence Carroll, (the holder of a power of attorney for J. Robert Collins, the deceased manager of RCG Holdings); and Regina C. Rafferty (the executor of Mr. Collins' estate, and Secretary and current Manager of XF, and Successor Trustee of the J. Robert Collins 2006 Trust), are the defendants in a state court case currently pending in Cook County. (Am. State Compl. ¶¶ 13-16, Not.

of Removal, Ex. 6, Dkt. No. 1-6.) Plaintiffs contend that they are insured under the 2017 and 2019 policy for any resulting damages in the Cook County state court case. (*Id.* ¶ 1.) Specifically, Plaintiffs argue coverage exists because the case involves two separate claims, the first occurring during the term of the first policy and the second occurring during the term of the second policy. (*Id.* ¶¶ 7–10.) The Defendant denies coverage under the second policy because it contends that both arise out of the same lawsuit against the insured Defendants and therefore constitute a single claim under the terms of the earlier issued policy. (*Id.* ¶¶ 27–32.) The underlying lawsuit, *Dreadnought Partners, LLC, et al. v. A. Lawrence Carroll, et al.*, is currently pending in the Circuit Court of Cook County Chancery Division, Case No. 2019 CH 12127. (*Id.* ¶ 1.) The four Plaintiffs in the *Dreadnought* case are Dreadnought Partners, LLC (a current member of XF), Shirley Smith as Trustee of the Leslie Rosenthal 2012 Trust, Harriet Rosenthal, and Arla Rosenthal. (*Id.* ¶ 9.)

A review of the historical background clarifies the generational relationships of the parties and the stakes involved. As pled in the *Dreadnaught* complaint, in 1988 two commodity brokerage firms, Rosenthal & Co. and Collins Commodities, merged into Rosenthal Collins Group, LLC and became one of world's leading regulated Futures Commission Merchants. (State Compl. ¶ 43, Not.

of Removal, Ex. 4, Dkt. No. 1-4.) In 2012 the firm was reorganized to become a wholly owned subsidiary of RCG Holdings, LLC (collectively, the "Company") organized under Illinois law and subject to the Company's Operating Agreement. (*Id.* ¶¶ 44-45.) The Company was co-managed by Leslie Rosenthal ("Rosenthal") and J. Robert Collins ("Collins"), heads of the respective firms that had merged in 1988. (*Id.* ¶ 51.)

Company membership was divided into two classes, A and C. (*Id.* ¶ 46.) Class A controlled the operation of the company and was split evenly between the two managers. Rosenthal owned half through a 49% interest held in Dreadnought Partners, LLC and 1% held by Rosenthal personally, and Collins owned half with 49% held in Knot, LLC and 1% held by Collins personally. (*Id.* ¶ 48.) Class C membership included Rosenthal's widow Harriet and their children and grandchildren, company employees, and investors. (*Id.* ¶ 49.) Class C members also had a preference in distribution if the company was to be liquidated. (*Id.* ¶ 59.)

After Leslie Rosenthal's death on September 16, 2017, Collins became the sole manager. (*Id.* ¶ 52.) Around this same time, some of the accounts fell on hard times, leaving the accounts of Leslie Rosenthal's Class A member account and Andrew Rosenthal's Class C member account millions of dollars underwater. (*Id.* ¶¶ 70-74.) Collins, now sole manager, requested that some Rosenthal Class C

members and the Dreadnaught Partners, LLC Class A member, also a Rosenthal company, to agree to "net-down" their accounts to offset the negative accounts of the underwater Rosenthal member accounts. (*Id.* ¶¶ 75-76, 83.) He proposed a 2017 Member Account Agreement that would give him the authority to carry out the net-down. (*Id.*) At the time, the Operating Agreement did not require a net-down to be made by members of either class, nor did it require members holding negative accounts to eliminate their negative balances. (*Id.* ¶¶ 64-69.)

As a result of the disinclination of the Rosenthal members with positive balances to accept the proposed agreement, Collins threatened to shut down the company if the members failed to go along with the proposed agreement. (*Id.* ¶ 76.) Such an action would jeopardize so-called "hot money" held in Class C member accounts which was used to meet trading margin escrow requirements under federal regulations in order to stay in business. (*Id.* ¶¶ 77-78.) Further, a shut-down would destroy the value of the company's assets and subject the company to the claims of customers, lenders, lessors, vendors, and regulators, and would render member accounts valueless, and expose them to liability for some of the company's losses. (*Id.* ¶ 79.)

Therefore, on December 13, 2017, the Rosenthal Class C members executed the Member Account Agreement. (*Id.* ¶ 80.) On

February 9, 2018 Collins exercised the discretion granted by the Member Account Agreement and netted-down the accounts held in Dreadnought Partners, LLC and other Rosenthal family member accounts. (*Id.* ¶ 86.) These accounts were reduced by a total of $13,274,949.90. (*Id.* ¶¶ 88–90.) On or after February 13, 2018 the assets of the company, including the name RCG Holdings, were sold. (*Id.* ¶ 94.)

On September 10, 2019, J. Robert Collins also passed away. (*Id.* ¶ 41.) Prior to Collins' death, A. Lawrence Carroll ("Carroll"), a plaintiff in this proceeding (and defendant in the *Dreadnought* case), began managing the company pursuant to a power of attorney granted to him by Collins and executed prior to Collins' death. (*Id.* ¶ 32.)

On July 1, 2019, the original Secretary of the Company resigned. (*Id.* ¶ 120.) Carroll engineered Plaintiff Regina C. Rafferty's ("Rafferty") appointment to the office of Secretary of the Company. On or around July 3, 2019, acting in his manager capacity, Carroll also appointed the Raffety as successor trustee of the J. Robert Collins 2006 Trust, which held Knot, LLC's Class A membership in the Company. (*Id.* ¶¶ 33–38.)

On July 9, 2019, the company made an interim distribution of $16,262,742.26 to the Collins Trust, Knot, LLC, and Dreadnought LLC. (*Id.* 138–139.) The Dreadnought plaintiffs contend that the

forced net-down, the sale of company assets, and the interim distribution were done in violation of the Operating Agreement and Illinois law.

In apparent preparation for the interim distribution, Rafferty, in violation of the Operating Agreement and Illinois law, caused the Class A memberships to be redistributed to the detriment of the Dreadnought plaintiffs on July 3, 2019. (*Id.* ¶ 130.) Post-redistribution, the amended Class A membership was 68.3% to the J. Robert Collins Trust, 13.4% to Knot, LLC, and 18.3% to Dreadnought Partners, LLC. (*Id.* ¶ 132.) Even though Dreadnought's membership was reduced, Rafferty did not honor these reduced percentages in making the interim distribution. (*Id.* ¶ 147.) The actual distribution, which was made in July 2019, allocated $15.4 million to the Collins Trust and only $299,210.00 to Dreadnought. (*Id.* ¶ 144.)

On October 5, 2019, Rafferty became Executor for Collins' Estate. (*Id.* ¶ 42.) The Dreadnought lawsuit was filed on October 18, 2019. The original Complaint consisted of six counts: Count I – Breach of Fiduciary Duty against Rafferty as Executor of the Estate of Collins; Count II - Aiding and Abetting Breach of Fiduciary Duty against Raffety and Carroll; Count III – Conversion against Carroll and Rafferty; Count IV – Unjust Enrichment against Rafferty as Executor and Rafferty as Successor Trustee of the

Collins Trust; Count V – Fraudulent Transfer against all defendants; and Count VI – Constructive Fraud against all defendants. (*Id.* ¶¶ 158-203.) The original complaint alleged two separate wrongdoings: the net-down of the Dreadnought membership accounts wrongfully carried out by Collins in 2018, and the July 2019 interim distribution made by Rafferty that shortchanged the Dreadnought plaintiffs. These two actions were joined together in the six counts. (*Id.*)

The Dreadnought Complaint was amended on December 2, 2020, reducing the case to two counts: Count I, against Rafferty as executor of Collins Estate, and is based on the forced "net-down" of the Dreadnought membership accounts, in violation of Collins' fiduciary duty as manager; and Count II, against Carroll and Rafferty, individually, and as successor trustee for the J. Robert Colins 2006 Trust, and is based on breach of fiduciary duty for making the wrongful distribution of Company assets to the Collins Trust to the detriment of the Dreadnought plaintiffs. (Am. State Compl., Letter to the Court, Ex. 1, Dkt. No. 24-1.) Ace has moved to dismiss. (Dkt. No. 28.)

## II.  <u>THE POLICIES IN QUESTION</u>

Ace issued two claims-made and reported policies that are the subject of this Motion: A Private Company Management Liability Policy issued to RCG Holdings, LLC, for the period from May 31,

2017 to February 8, 2019, and a similar one issued to XF, LLC (The successor to RCG Holdings), for the period from February 8, 2019 to February 8, 2020. (2017 Insurance Policy, Not. of Removal, Ex. 2, Dkt. No. 1-2; 2019 Insurance Policy, Not. of Removal, Ex. 3, Dkt. No. 1-3.) The relevant insuring agreements and definitions are the same for each policy, with two exceptions: the 2017 policy had an "extended reporting period" endorsement which extended the notice and reporting deadline to February 8, 2025, and the 2019 policy had a Prior Acts Exclusion for all claims arising prior to February 8, 2019. The policies cover defense costs as well as damages.

Under the policies the relevant terms are defined as follows:

**Claim** means:

1. a written demand against the **Insured** for monetary damages, or, except with respect to Insuring Agreement B, Employment Practices Liability, non-monetary or injunctive relief;

2. a civil proceeding against the **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

3. a criminal proceeding against the **Insured** commenced by a return of an indictment, information, or similar document, or receipt or filing of a notice of charges;

4. an arbitration proceeding against the **Insured** seeking monetary damages or non-monetary or injunctive relief;

5. a civil, administrative, or regulatory proceeding against the **Insured** commenced by the filing of a notice of charges, investigative order, or similar document; or

- 8 -

6. a civil, administrative, or regulatory investigation against the **Insured**, commenced by the service upon or other receipt by the **Insured** of a written notice or subpoena from the investigating authority identifying the **Insured** as an individual against whom a civil, administrative or regulatory investigation or proceeding may be commenced;

including any appeal therefrom. However, notwithstanding the foregoing, with respect to Insuring Agreement B, Employment Practices Liability, **Claim** shall not include a labor or grievance proceeding which is pursuant to a collective bargaining agreement.

(2017 Insurance Policy at 6; 2019 Insurance Policy at 6.) The relevant portions and the term "Wrongful Act" are defined as:

**Wrongful Act** means:

1. With respect to Insuring Agreement A, Management Liability: any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by:

　　a. any **Insured Person** in his or her capacity as such, or any matter claimed against any **Insured Person** solely by reason of his or her serving in such capacity, with respect to Insuring Agreement A1, Management Liability, and Insuring Agreement A2, **Company** Reimbursement;

　　b. the **Company**, with respect to Insuring Agreement A3, **Company** Liability; or

　　c. any **Outside Entity Insured Person** in his or her capacity as such, or any matter claimed against any **Outside Entity Insured Person** solely by reason of his or her serving in such capacity, with respect to Insuring Agreement A4, **Outside Entity** Management Liability.
　　　　　　　　　. . .

The foregoing definitions shall apply equally to the singular and plural forms of the respective words.

- 9 -

(2017 Insurance Policy at 9–10; 2019 Insurance Policy at 9–10.)The prior Acts Exclusion contained in the 2019 policy provides that "The Insurer shall not be liable for Loss on account of any claim . . . alleging, based upon, arising out of, or attributable to any Wrongful Act committed, attempted or allegedly committed or attempted, in whole or in part, before 02/08/2019." (2019 Insurance Policy at 46.)

Insurers offer two different approaches to determine coverage when writing liability insurance: "claims-made" and "occurrence" policies. The difference is the event that triggers coverage. An occurrence policy's coverage is triggered by the date of the event or accident giving rise to the claim. The policy in force at the time of the event or accident provides the coverage. In the case of a claims-made policy, coverage is triggered by the date the insured first becomes aware and notifies the insurance company of the claim. The policy in force on the date of awareness and notice provides coverage. If a claim-made policy contains a "prior acts" date, this is what determines the extent of retroactive coverage. Claims resulting from acts occurring before this date are not covered, *i.e.,* for the 2019 policy acts occurring prior to February 8, 2019. As asserted by Ace in its briefing, this provision is intended to prevent double coverage.

### III.  **DISCUSSION**

Plaintiffs contend that the Dreadnought suit alleges two separate wrongful acts committed by them. The first occurred in December of 2017 when Collins allegedly forced the Dreadnought Plaintiffs to agree to net-down their membership accounts and then wrongfully executed the net-down in February 2018 in violation of their fiduciary duties, Illinois law, and the Operating Agreement. The second occurred in July of 2019 when Mr. Carroll and Ms. Rafferty distributed substantial cash assets of XF to the Collins Trust at the expense of the Dreadnought Plaintiffs, also in violation of their fiduciary duties, Illinois law, and the Operating Agreement. Ace contends that both alleged wrongful acts are pled in the same Dreadnought complaint, which, it insists, constitutes a single claim under as defined in its policy. According to Ace, the policy definition of "claim" limits coverage to wrongful acts that are alleged in a "civil proceeding" against the Insured seeking monetary damages and commenced by the service of a complaint.

The parties agree to the ground rules for interpreting insurance policies. Illinois courts interpret insurance contracts pursuant to the general rules of contract interpretation by ascertaining and giving effect to the intent of the parties as expressed in the contract and, if unambiguous and does not offend

public policy, to apply as written. *Netherlands Ins. Co. v. Phusion Projects, Inc.*, 737 F. 3d 1174, 1177 (7th Cir. 2013). However, both the policy terms and the allegations in the underlying Complaint are liberally construed in favor of the insured and any doubts and ambiguities are resolved in favor of the insured and against the insurer. *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 811 (7th Cir. 2010). This is likewise true when interpreting policy exclusions. *State Farm Ins. Co. v. Moore*, 103 Ill. App. 3d 250, 255-56 (1981).

Ace asks the Court to interpret the prior acts exclusion in the 2019 policy to defeat coverage under that policy for the Dreadnought Count II which charges the wrongful distribution to the Collins' trust, even though the act occurred in July 2019, during the term of the 2019 policy. Ace argues that the exclusion was intended to prevent double coverage by excluding coverage in areas normally covered under other policies. In support, Ace cites *Aetna Cas. & Sur. Co. v. Beautiful Signs, Inc.*, 146 Ill. App. 3d 434 (3rd Dist. 1986). Reliance on *Beautiful Signs*, however, is misplaced. The insurer in that case, Aetna, insured an employer of an employee who was killed while at work on the property of a third party. *Id.* at 435. The employee's estate sued the third party for wrongful death. *Id.* The third party sought to bring in the employer seeking contribution. *Id.* Aetna declined coverage for contribution

based on an exclusion in its policy for death or bodily injury to its employees. *Id.* at 436. The Illinois Appellate Court held the exclusion to be applicable because any contribution sought from the employer on account of the death or bodily injury of an employee was clearly covered by the exclusion. *Id.* The Illinois Appellate Court pointed out that the purpose of the exclusion was to prevent double coverage on the part of the employer because he was liable for his employee's death under the state worker's compensation laws. *Id.* Requiring the employer's insurance to contribute to payment for the employee's death in addition to the payment of worker's compensation benefits would constitute double coverage which the exclusion was intended to avoid. *Id.*

This case is different. The prior acts exclusion is, as explained by Ace, to prevent double coverage. In this case, the double coverage danger is created by the eight-year extended reporting date contained in the 2017 policy. But the danger is immediately remedied by the prior acts exclusion contained in the 2019 policy. To illustrate, suppose the insured commits some wrongdoing in 2018 within the coverage of the 2017 policy but a claim is not made until 2020. Without the prior acts exclusion in the 2019 policy, the insured would be covered under both policies and there would be double coverage. But that danger does not exist in this suit.

Plaintiffs are asking to be covered by the 2017 policy for an act that occurred and was reported during that policy period. They are also asking to be covered by the 2019 policy for acts that occurred and reported during the period that the 2019 policy was in effect. The Amended Complaint clearly meets the policy reporting requirement. Plaintiffs are not demanding that the 2017 policy applies to the 2019 claim, so they are not seeking double coverage. They are seeking to be covered by the 2017 policy for the 2017 alleged wrongdoing and seeking coverage from the 2019 policy for the 2019 alleged wrongdoing. The obvious problem to which Ace is addressing is not double coverage but increased policy limits. If the claims are covered by separate policies, the policy limits of each would be applicable to the specific covered claim. This is not double coverage but separate coverage.

Ace also cites *Market Street Bancshares, Inc. v. Federal Insurance Co.*, 962 F.3d 947 (7th Cir. 2020). This case was brought against an insurer pursuant to a claims-made professional liability insurance policy seeking to recover losses, including defense costs, incurred in defending an underlying lawsuit alleging breach of contract and breach of fiduciary duty. *Id.* at 949. The lawsuit was filed more than ten years prior, long before the issuance of the policy in question. *Id.* at 950. The suit was bifurcated and was initially considered on a motion for summary

- 14 -

judgment on the liability issue which ended in favor of the plaintiff prior to the issuance of the policy in question. *Id.* Later the issue of damages was tried, which was after the issuance of the policy in question. *Id.* at 950-51. The insurer denied coverage for the damage phase arguing that, under the terms of its policy, the claim consisted of the lawsuit which had been filed well before its claims-made policy was issued. *Id.* at 951. The insured contended that the damage phase was a new claim and therefore was covered. *Id.* The Seventh Circuit sided with the insurer and affirmed the grant of summary judgment in its favor. *Id.* at 955. The court held that a lawsuit consists of both liability and damages, and therefore could not be separated under the terms of the policy. *Id.* This makes sense: a suit for damages includes both the issue of liability as well as the issue of damages. *Id.* However here we have a different situation: a suit for two separate claims that each includes the issue of liability and the issue of damages.

A provision of its policies not cited by Ace is the Prior or Pending Proceeding exclusion contained in the 2019 policy. It reads:

I. Prior or Pending Proceeding

alleging, based upon, arising out of, or attributable to:

- 15 -

> 1. any prior or pending litigation or administrative
> or regulatory proceeding filed on or before the
> prior or pending proceeding date shown in Item 5 of
> the Declarations, or the same or substantially the
> same **Wrongful Act**, fact, circumstance, or situation
> underlying or alleged therein; or
>
> 2. any other **Wrongful Act** whenever occurring which,
> together with a **Wrongful Act** underlying or alleged in
> such prior or pending proceeding, would constitute
> **Interrelated Wrongful Acts**.

(2019 Insurance Policy at 12.) Interrelated wrongful is defined as:

> **Interrelated Wrongful Acts** means all **Wrongful Acts**
> that have as a common nexus any fact, circumstance,
> situation, event, transaction, cause or series of
> related facts, circumstances, situations, events,
> transactions or causes.

(*Id.* at 7.) Common nexus is generally understood to mean that the claims arise from common facts and circumstances that are seen from a side-by-side review. *Cushman & Wakefield v. Illinois National Ins. Co.*, 2018 WL 1898339 at *17 (N.D. Ill. April 20, 2018). Here the only commonality immediately apparent to this Court is the fact that Collins' interests benefited from both alleged fiduciary violations. Whether this provision applies, how it would be interpreted, or whether it is ambiguous if it does, is waived as it was not raised by Ace.

Two other matters raised by Ace in its Motion are whether the requested indemnity is premature as that the Dreadnought case has not concluded, and whether Ace has violated 215 ILL. COMP. STAT.

- 16 -

5/155 (bad faith refusal to reimburse defense costs and acknowledge coverage).

Ace first argues the current case has been prematurely brought before this Court as there has been no judgment as to damages in the underlying action. However, an insured is not prohibited from maintaining a declaratory judgment to determine indemnity rights unless the suit would require factual findings relevant to the underlying lawsuit, as this could subject a party to possible collateral estoppel. *Bonnie Owen Realty, Inc. v. The Cincinnati Ins. Co.*, 283 Ill. App. 3d 812, 818–19 (Ill. App. Ct. 1996).

Ace acknowledges its agreement to indemnify Carroll and Rafferty for all amounts they are legally obligated to pay. (*See* Ace Mem. at 3, Dkt. No. 29.) Whether Ace is obligated to pay anything, of course, is dependent on the outcome of the Dreadnought litigation. The main issue in this case is whether Count II is to be covered by the 2019 policy or the 2017 policy. This issue does not appear to be relevant to any issue in the Dreadnought case. The issue in *Dreadnought*, obviously, is whether Collins and/or Rafferty was guilty of breach of fiduciary duty. If the Collins' estate and Rafferty win, Ace will of course have no occasion to indemnify the estate. Therefore, there is no overlap between the two cases.

Ace also seeks to have the Plaintiffs' claim for violation of Section 155 dismissed. However, there is an issue of fact whether Ace's conduct was vexatious, which is highly factual and not subject to a dismissal on motion.

## IV.   CONCLUSION

For the reasons stated herein, Ace American's Motion to Dismiss is denied.

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

Dated: 9/10/2021